444

*In re* L.L.S., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. James Sallee *et al.*, Respondents-Appellees).

Fourth District   No. 4—90—0761

Opinion filed August 29, 1991.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Robert T. Hall, of Springfield, for appellees.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 1990, the State filed a petition to terminate the parental rights of respondents Ruby Sallee and James Sallee, regarding their daughter, L.L.S., born April 13, 1988. After a hearing, the trial court denied that petition. The State appeals, arguing that the trial court's denial of the petition was contrary to the manifest weight of the evidence. We agree and reverse.

I. PROCEDURAL BACKGROUND

In the July 1990 petition, the State alleged that respondents were unfit parents, as defined in section 1(D) of the Adoption Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)), for the following reasons:

(1) they failed to maintain a reasonable degree of interest, concern, or responsibility as to L.L.S.'s welfare (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(b));

(2) they failed to make reasonable progress toward the return of L.L.S. to them within 12 months after she was adjudicated a neglected and dependent minor (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m)); and

(3) they evidenced their intent to forego their parental rights to L.L.S. by their failure for a period of 12 months either to visit the child or to maintain contact with or plan for the future of the child (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(n)).

In addition to these allegations, the State's petition also alleged that Ruby failed to make reasonable efforts to correct the conditions which were the basis for removing L.L.S. from her custody (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m)).

A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is not sufficient to support other grounds alleged. (See *In re Edmonds* (1980), 85 Ill. App. 3d 229, 232-33, 406 N.E.2d 231, 234-35.) As noted earlier, the trial court denied the State's petition, including that portion alleging the respondents to be unfit parents because of their failure to make reasonable progress toward the return of L.L.S. to them within 12 months after her adjudication of neglect and dependency.

Because we find that the trial court's denial of the State's petition regarding this allegation was contrary to the manifest weight of the evidence, we will only review evidence which pertains to that allegation.

## II. The Evidence

Nancy Ingle, a supervisor with the Department of Children and Family Services (DCFS), testified for the State at the August 1990 hearing on the State's petition to terminate the respondents' parental rights. Ingle was the first DCFS caseworker to work with L.L.S. and the respondents when the court ordered L.L.S. placed after the court conducted a shelter care hearing in July 1988. Ingle continued as L.L.S.'s caseworker until January 1989, when she began her supervisory position.

Ingle arranged a visit for respondents with L.L.S. on August 29, 1988, which both respondents attended. Ingle arranged that visit through her personal contact with Ruby at the August 23, 1988, adjudicatory hearing, and her phone conversation with James on July 26, 1988, when he phoned Ingle from Indiana. He said he had gone there to live because he and Ruby had "split up." Although James visited L.L.S. by himself on August 22, Ruby and James were back together by the August 29 visit.

In October 1988, Ruby told Ingle that she and James were separated and that they had "split up" seven times previously. After a preliminary conference with Ruby, Ingle prepared a service plan which set forth the steps to be taken by respondents to overcome their parental deficiencies so that L.L.S. could be returned to their custody. Ingle testified that she had difficulty preparing the service plan because of respondents' instability and because of her uncertainty as to whether they would continue to live together. Ruby and James were not married when L.L.S. was born and did not marry until February 1989. Ingle formulated the service plan for Ruby in October 1988, but she was not able to do so for James until December 1988 because he had left Springfield and Ingle did not know his whereabouts.

Ingle discussed the service plan with both Ruby and James, explaining to respondents that they would both have to do the following: (1) obtain psychological evaluations, (2) enroll and actively participate in parent training classes, (3) obtain substance-abuse assessments, (4) maintain a stable and appropriate residence, (5) visit L.L.S., and (6) show their interest in her. Neither respondent disagreed with these objectives, and both said that they would try to achieve these goals.

The service plan Ingle formulated in October 1988 was to be reviewed in the normal course of business by DCFS staff in December 1988. Both respondents were invited to attend that review session, but did not do so. As of December 1988, a few of the minor objectives of the service plan had been met, but basically the respondents had accomplished very little. As of December 1988, neither respondent had established an adequate home; neither had attended parenting classes; neither had received any counseling; neither had undergone any psychological evaluation or drug and alcohol assessment; and neither had visited with L.L.S. on a regular basis. In fact, the only visits with L.L.S. were on August 29 and September 7, by Ruby and James together, and on September 13 and October 12, by Ruby alone. James reportedly left town after September 12.

The service plan Ingle prepared also included provisions that respondents initiate discussion with her regarding L.L.S. Although Ruby knew that Ingle was her caseworker and how to contact Ingle, Ruby never did so to inquire about L.L.S.

After James left town in early September 1988, he had no further contact with Ingle or L.L.S. until December 15, 1988, when he asked to visit L.L.S. A visit was arranged for him, but he called on the day of the visit and cancelled, saying it was too cold to go.

At the December 1988 review of the service plan, the staff decided to continue with the objectives of the plan.

Sharon Cagel testified that she was the coordinator of the DCFS homemaker program and that she had earlier been employed as a DCFS homemaker. In the latter capacity, she was involved with Ruby, James, and L.L.S., and was present during visits they had on August 29 and September 7, 1988. She supervised a visit James alone had with L.L.S. on August 22, 1988, and she was told that James left town on September 13.

Cagel supervised visits between Ruby and L.L.S. on September 13 and October 12. L.L.S. was then between three and four months old and she cried the entire time despite Ruby's attempts to comfort her. Ruby would get very upset when L.L.S. would cry and ask Cagel if she was doing the right things. Cagel frequently had to calm L.L.S. during these visits, and Cagel's efforts usually worked. Overall, the visits did not go well because of the crying.

Cagel testified that there should have been more visits and that she usually attempted to set up a weekly visit for a regular time. If the parents were not going to show up, they were supposed to call to let her know. Cagel frequently scheduled visits for respondents when they neither showed up nor called. Based upon her observations of

both respondents, Cagel opined that they both had limited parenting skills and limited knowledge of how to care for a baby. Cagel testified that to her knowledge respondents did not visit L.L.S. from October 1988 to April 1989.

Kip Smith, a caseworker with DCFS, testified that he had been assigned to work with respondents and L.L.S. from February 1989 through November 1989. He took over as caseworker from Ingle and tried to implement the service plan that she had put in effect.

Smith contacted James' mother in Indiana in an attempt to locate James, and near the end of March 1989, James called Smith from James' mother's residence. Smith believed Ruby was present with James when James made the phone call. As a result of the phone call, Smith had his first in-person contact with Ruby and James on April 13, 1989. He reviewed the service plan with them, specifically its objectives. They each acknowledged to Smith that they had not yet done anything to achieve the objectives in the service plan. However, both Ruby and James told him that now that they were back in Springfield, they were ready to work on the tasks they had been given and willing to set up regular appointments. They even signed consents for the release of information from service providers they were to contact, such as psychologists and persons presenting parenting classes.

On June 22, 1989, the service plan was reviewed by DCFS, but again neither Ruby nor James attended, even though Smith had informed them both of when and where the staff review would be held. At the time of this review, the only goal Smith could give the respondents credit for achieving was three visits they had had in April 1989 with L.L.S.

Smith testified that the April 1989 visits Ruby and James had with L.L.S. did not go too badly considering that L.L.S. did not recognize them. The first and second April visits went fairly well, but during the second half of the third April visit, L.L.S. cried continuously and was inconsolable. Ruby seemed like she did not understand what to do to help and acted as if she were being rejected by the baby. She sat off in a corner and did not even try to deal with the problem.

In March and April 1989, respondents told Smith that they were living in a community shelter in Springfield and looking for an apartment. On April 19, James claimed to have obtained employment, and on April 26, they claimed to have found an apartment. However, on May 3, 1989, the day of a scheduled visit, respondents called to say that they could not make the visit and that they were leaving town to

return to Indiana. They said they would be back for a visit on May 10, but they did not show up for that visit either.

Smith testified that Ruby called DCFS on June 5, 1989, left a message for him to call her, but did not leave a number. On June 29, James called to inform Smith that he was going to divorce Ruby and that he was living with his mother in Indianapolis. On July 17, Ruby responded to a letter Smith had sent her requesting more information about her background. According to Ruby's letter, she was then also living in Indiana, but with a new boyfriend.

James called DCFS on July 24, 1989, and left a number for Smith, but when Smith called back, the number was not in service. On August 2, Smith received a letter from James, stating that he had obtained a psychological evaluation and was contemplating going to parenting classes in September. James also claimed to be training for a new job and wished to have some visits set up on Fridays in the upcoming months.

On August 7, 1989, Ruby called Smith, but he was not in. When he returned her call, there was no answer. On August 17, James phoned Smith to say he had moved again and had found another job. On August 25, James and Ruby called Smith at the same time to inform him that they had gotten back together the night before and wanted to set up a visit for September 6, which was done. However, on September 6, James called and informed Smith that Ruby had left again. James said he was not in Springfield, but that when he did get there, he would call Smith to set up a visit for the next day. James indicated he was somewhere in Indiana, but Smith could not recall whether it was Columbus or Indianapolis.

On August 31, 1989, James phoned Smith and said he was again unemployed. He also told Smith that he was planning to go to a mental health center to set up some appointments. Sometime prior to December 1989, James did send Smith a completed psychological evaluation.

The service plan was reviewed again in December 1989, and again neither James nor Ruby attended. James had met only two goals by that time: (1) he had obtained a psychological evaluation, and (2) he had kept in contact (at least by phone) on almost a monthly basis. During his phone calls, James would inquire about how L.L.S. was doing. Smith noted that Ruby had met no goals, and that during her infrequent phone calls, she did not inquire about L.L.S.

Smith testified that James' psychological evaluation gave him concern about James' DUI history and his past incarcerations. Smith believed that James would need counseling to be an adequate parent, a

recommendation Smith made to James throughout the entire time Smith was dealing with James. Smith advised James that he could get counseling at the local mental health center and told him where he could find counseling and parenting classes in Indiana. Smith had even contacted the mental health facility in Indiana that James said he was attending so that Smith could speak to them about the releases signed, enabling Smith to receive information about James. Smith also asked the staff at the Indiana facility if they could provide services for James, and they said that they could. However, James never took advantage of the services available.

Smith testified that in addition to the occasional calls and letters he received from James and Ruby, he tried to call them wherever he could find them, but he had difficulty because they were always on the move. At times, he was not even sure what State they were in. When Smith first met them, they had been in Florida prior to moving to Indiana.

In December 1989, the case was transferred to Mary Scaggs of DCFS, and Smith had no further contact with Ruby or James.

Mary Scaggs testified that she was employed by DCFS and assigned in December 1989 to the case of respondents and L.L.S. She continued the service plan that Smith had in place. Scaggs reiterated that the objectives in the service plan for both Ruby and James were the following: a substance-usage assessment, a psychological evaluation, attendance at parenting classes, documentation of income over a six-month period of time, some kind of documentation of the maintenance of a residence over a six-month period of time (such as mail received), and a further requirement that the residence be appropriate—that is, free of hazards, suitable, and not injurious for a young child. Furthermore, DCFS was to be given access to this residence to check its suitability. Other objectives were that Scaggs was to be notified within 24 hours of any address change, and Ruby and James were to send L.L.S. age-appropriate cards and gifts for her birthday and for the holidays. The same objectives were set for both Ruby and James. Other than the psychiatric evaluation James obtained and a doll he sent L.L.S. for her birthday, James had done nothing to meet any of the other objectives of the service plan.

Scaggs testified that between December 5, 1989, and July 3, 1990, James would call her occasionally, but in those calls he never asked about L.L.S.' well-being. Ruby had also sent L.L.S. a doll for her birthday, but neither Ruby nor James visited with L.L.S. from December 1989 to July 1990. During that period, Scaggs had one phone call from Ruby in response to a phone call Scaggs made trying to reach

her. Scaggs also sent letters to Ruby, including one by certified mail that was returned unclaimed. Once, Scaggs called for Ruby and left a message with someone who said Ruby did not live there anymore but that the person could get Ruby a message. Two days later Ruby called Scaggs back, and the first thing Ruby said was, "what do you want?" Ruby was living in Columbus, Indiana, when she returned Scaggs' call.

Scaggs said that every time she talked to James over the telephone she told him it was necessary for James to meet with her to discuss the service plan and any concerns James might have about that plan. James agreed, set up two appointments with Scaggs, but failed to keep either of them. He never called to explain why he failed to appear. On July 5, 1990, James called to say he had a new address, and an appointment was arranged for him with Scaggs on July 23, 1990. James did not show up, and Scaggs did not hear from him again until early August.

According to Scaggs, the regular DCFS service plan review allows the parents the opportunity to meet with the caseworkers, go over the service plan point by point, and raise questions or explain difficulties they might be having. Through these discussions, the service plan can be changed, if appropriate. While neither Ruby nor James ever attended an administrative case review, they both had the opportunity to discuss the service plan in detail with Scaggs and other DCFS caseworkers. Ruby never expressed to any DCFS caseworker any problems she might have meeting the objectives of the service plan. Also, James never expressed any complaint regarding the objectives in the service plan.

Scaggs testified that Ruby was responsible for finding a parenting class to attend in Indiana, and contacting Scaggs if she was unable to do so. Scaggs explained that she expected Ruby to take the initiative of asking for Scaggs' assistance if Ruby needed it to meet the objectives of the service plan. Scaggs testified that psychological assessments, alcohol assessments, drug assessments, and parenting classes can be arranged on a sliding-fee scale by agencies all over the country.

Scaggs testified that service plans are expected to be completed within six months or they are repeated. She testified that she told both Ruby and James that their failure to achieve the objectives set forth in the service plan could result in the termination of their parental rights. Whenever Scaggs spoke with Ruby and James on the phone about the possibility of visiting L.L.S., Scaggs always told them that the first thing they needed to do was to have an appointment with her so that a visitation schedule could be set up.

James occasionally requested visits in his telephone conversations with Scaggs, but Ruby never did. James never followed through on any of these discussions regarding visits.

Ruby testified that she was 23 years old and living in Springfield. Her parents divorced when she was 11 years old, and she grew up in Texas with her father. Her mother lives in Florida. She attended school through the 10th grade. While in school, Ruby attended special classes. She was not married to James when L.L.S. was born, and she did not believe she was then sufficiently mature to have a child. L.L.S. is her only child and her first pregnancy. Ruby admitted telling a caseworker that she had had another child who had died, but she testified that that was not true.

During her pregnancy, Ruby was living with James in Lawrence, Massachusetts. After James was fired from his job there, they went to Indianapolis. L.L.S. was born in April 1988, and she and James were married in February 1989. She and James owned a car around March 1989, but one day she "woke up and he was gone." He called later to tell her that the car had broken down in Nashville, Tennessee. It was never repaired.

When DCFS took L.L.S. from Ruby's custody, Ruby thought it was a good idea at the time because James had left. Ruby "was taking it out on [L.L.S.]," and did not think she could cope. Ruby testified that she had slapped L.L.S. (who at the time was not yet three months old). The slapping incident occurred while Ruby was living at the Inner City Mission in Springfield and did not have any income.

Ruby testified that she did not originally understand what she had to do in order to get L.L.S. back, but she understood now. Ruby explained her understanding as, "You're supposed to go to family planning classes, take a drug test and all to get her back." She further explained that this included "[p]arenthood classes, counseling, and drug and alcohol tests." She claimed to understand these requirements for the first time only when James "sat down and explained [them] to me." However, she testified that she did not go through the counseling and evaluations because "I didn't have no [sic] money and we was [sic] always on the road."

After L.L.S. was taken from her custody, Ruby testified that she remained in Springfield for about a month and then went to Georgia "[t]o try to find work and a place to get her back." James had told her that jobs were available down there. She and James remained in Georgia for two or three months and then went to Indianapolis, where James got a job, but Ruby did not recall what it was. At that time, she and James were married. They stayed in Indianapolis for

about two months, living with James' mother. James subsequently lost that job, and they returned to Springfield in March or April 1989.

Ruby testified that they returned to Springfield to try to get L.L.S. back and stayed there for about three months. While in Springfield, they again lived at the Inner City Mission. For a while, James was working at McDonald's. Ruby testified that they left Springfield and returned to Indianapolis "[b]ecause we got the car and we decided to go and find work and a place to stay."

James found a roofing job in Indianapolis that lasted two to three days. They stayed in Indianapolis for about two months and then went to Florida. James worked out of the laborer's hall in Florida, but left after a month or two when they realized "we could not make it down there."

Ruby and James then moved to Columbus, Indiana, but they were separated during that time. During this separation, James went back to Florida for a while before returning to Indiana. Ruby testified that they got back together around September 15, 1989, when they were both living in Indianapolis. Ruby stayed with James for about a week in Indianapolis, but they then separated again and she went back to Columbus. Ruby lived in Columbus until around April 1990, when she and James got back together and returned to Springfield.

Ruby testified that since L.L.S. had been taken from their custody (in July 1988), she and James had separated "about seven times" although they remained married. At the time of the October 1990 termination hearing, they had been together for about 2½ to 3 months. Ruby testified that things were not working out great, and they were receiving income from Capitol Township. Ruby testified that she had not had a job since L.L.S. was born.

Ruby admitted that she had not visited L.L.S. between April 1989 and August 1990, explaining that she did not do so because she "didn't have the transportation to get back here [Springfield] to see [L.L.S.], and she did not have a job at the time." Ruby said that she did not have a car when she was in Indianapolis, and she could not afford to take the bus because of the cost. She said she asked her parents for money and they both said no. She testified that she could not make it to Springfield to visit L.L.S., but she admitted making several trips to Georgia, Florida, Indiana, and back and forth between those States. Ruby testified that when she and James moved to Georgia and to Florida, they had originally planned to establish permanent residences.

Ruby testified that she thinks about L.L.S. and would like to have her back. She claimed that she and James would no longer be moving

every few months and that they now planned to remain in Springfield "as long as it takes to get [L.L.S.] back."

Ruby acknowledged that L.L.S. was taken from her custody when L.L.S. was less than three months old, and that from the time DCFS took custody in early July 1988 until October 1990, Ruby had seen L.L.S. a total of approximately nine hours of her life. Ruby admitted that she had not seen L.L.S. since she was a year old. She knew she could have had visits every week with L.L.S., and when she moved to Indiana, she had planned on returning to Springfield for visits by hitchhiking. Ruby also testified that between the shelter-care hearing on July 5, 1988, and the adjudicatory hearing on August 23, 1988, she and James moved to Georgia, split up, and wound up back in Indiana. Ruby conceded that she knew moving to Georgia, Florida, and Indiana was going to make it very difficult to visit with L.L.S. They got back together at the adjudicatory hearing.

Ruby testified that the longest single time she had been together with James was six months. When she and James were separated, Ruby decided to remain in Indiana even though she did not have any family living in Indiana nor did she have a job; she conceded that there was nothing keeping her in Indiana, but she stayed there anyway. Ruby admitted that when she was living in Indiana while separated from James, she lived with another man for six months.

Under questioning by the guardian *ad litem*, Ruby admitted that she had known since at least June 1989 the steps she was supposed to take to get her child back—the parenting classes, the drug counseling, and the like—but that she did not do any of it. She explained, "I did not because I was in Indiana and I did not have no [*sic*] job or no [*sic*] money."

James testified that he was 35 years old, attended school to the seventh grade, and had obtained a GED. He believed that he and Ruby had been separated only four or five times at most. James testified that he had held seven different jobs since July 1988. Before L.L.S. was taken into DCFS's custody, the longest James had held a job was 1½ years. Since L.L.S. was taken into custody, the longest he had held a job was four to five months. James also acknowledged that he had not held a job for at least a year since 1979. His explanation for losing his jobs was the following:

> "Well, most of the time it's been because of either—to me I would say it was because of mine or Ruby's separations for one. For another, it would be trying to settle in a certain place.
>
> *** [A]t one point I'd have a job but no place to live, at another point I'd have a place to live but no job ***."

He explained that he had quit a job only twice; regarding the others, he claimed he either got laid off or left the job because he and Ruby moved.

James claimed that his finances were now sufficient to permit him to raise his daughter. When asked about his present job, he testified:

"A. Right now I'm working for a man, I'm—I'm self-employed actually.

\*\*\*

\*\*\* A. I'm just hauling like old block and stuff away and stuff like that for the man."

When asked how long this job will last, James explained, "It will last me—the work itself will last four days, but he's got other work that he'll have me doing in between and stuff like that." James claimed to be working five to six days a week, about eight hours a day.

James testified that no one ever told him that he should go through counseling. He also stated that he did not proceed with drug and alcohol testing because he thought it was all tied in with his psychological evaluation. He testified he had made arrangements to attend parenting counseling classes in Springfield starting in September 1990 but then admitted that he did not attend such classes, giving the following explanation:

"I had it set up for September, I believe it was, and they moved it—they moved it up, said they was filled at that time too at this place that I called, and of course, I moved since then, afterwards, after the time that this September set up, and the other one they, you know, they had not set no specific date on."

James explained that he did not visit L.L.S. between April 1989 and August 1990 because he was living in Indianapolis and had no transportation. He testified that he moved back to Springfield in August 1990 because he "felt that it was time to \*\*\* do something definite, and I knew that I'd have to stay in Springfield this time in order to get my daughter back." He claimed that he did not understand this at first, but he did now. He moved back to Springfield only after he got a letter from DCFS stating that they intended to terminate his parental rights. He thought that he could now have visits every weekend or every week with L.L.S.

James claimed that he was now prepared to go through counseling, parenting classes, and drug and alcohol assessments. He testified that he did not know how long he could have stayed away from L.L.S. and still retain some parental rights regarding her, explaining,

"I didn't understand half the stuff [DCFS told me] sometimes. It was never really explained to me to where I understood it."

James testified that he and Ruby did not then have a residence of their own but were staying in the home of another couple. He testified that he hoped to get a place in a rooming house and then an apartment for them as their finances improved. He claimed that he found out "within the past week" where to get a job for $15 an hour, but he never revealed the name of the employer or the nature of the job.

James claimed that he loved L.L.S. and wanted her to live with him and Ruby. He admitted, however, that he had had another child by his first marriage and had no idea where she was because his first wife divorced him and moved away with their daughter. That divorce was in Indiana when the child was one year old. James testified that his first wife divorced him and said she did not want to have anything to do with James because of his drinking. The child of his first marriage was now 10 years old, and James testified that he had tried unsuccessfully to locate her "through friends, through family, [but] nobody wants to tell me nothing [sic]. I don't understand how to go about it otherwise."

James admitted that since L.L.S. has been in the custody of DCFS, he has lived in Georgia, Florida, Indiana, and Tennessee, in addition to Springfield, Illinois. He lived in two different cities in Florida. At the time of the October 1990 termination hearing, he had been in Illinois approximately 1½ to 2 months.

James also admitted that he understood "about a year ago" the "paperwork" on what he was supposed to do to get L.L.S. back. James also admitted that he had set up appointments with DCFS to visit L.L.S. and did not keep those appointments. He claimed that he could not remember if he had called DCFS to tell them that he would not be making those visits.

### III. THE TRIAL COURT'S FINDINGS

After hearing evidence and arguments of counsel, the court entered a finding that the State had failed to prove by clear and convincing evidence that the parental rights of respondents should be terminated. Regarding the issue of whether respondents failed to make reasonable progress toward the return of the minor to them within 12 months after her adjudication as a neglected and dependent minor, the trial court stated the following:

> "The Court finds reasonable progress requires a minimum measurable or demonstrative progress. ***

\* \* \*

In this case, I do find that Mr. and Mrs. Sallee could have done better. They could have made better use of the opportunities available to them. They could have made more contact, they could have followed up better, they could have complied better. Those are all could haves, but I also find that they did make efforts and they are, although they are not as good as they could have been, there were contacts.

The testimony that the Court heard was that the first thing that the Sallees had to do for [L.L.S.]'s benefit was to solve their problems, and Mrs. Sallee's testimony is undisputed that a large part of the situation which brought about the one incident of an abuse adjudicated in this matter was the relationship with Mr. and Mrs. Sallee. That has been a rocky road to say the least. It doesn't matter whether they've had four or five or seven separations. They've had their problems.

The testimony appears that those problems have made great progress. I don't expect it's going to be Ozzie and Harriet in the Sallee household now or probably at any time in the future, but by the same token it appears that they have resolved that problem to some extent to a reasonable extent that that was something that had to be done, in this Court's opinion is one of the first things.

*The Sallees have to be taken as you find them. What's reasonable for the Sallees may not be reasonable for the next people that come before this Court. What's unreasonable for the Sallees may not be unreasonable for the next people that come before this Court.*

We have a situation where Mrs. Sallee is, I don't want to use the word handicapped, but by the same token she is not possessed, in this Court's opinion, based upon the observations of her and the evidence, with what wonderful mental resources that other people appearing before this Court appear to have.

She is aware of these limitations. She has, from the evidence, made some progress in that situation.

Mr. Sallee, from his own testimony, has a problem. He has a problem of drinking, he has a problem with a first marriage, he has a problem of other things, but he's made progress. The testimony is undisputed as to why the Sallees moved. They moved to get finances to start to get [L.L.S.] back. And that's the testimony this Court has, and I'm sure that if the moves were transfers by IBM if that's where Mr. Sallee worked, they were

transferring him to Georgia, then to Florida, and then to Illinois and back to Indiana, probably wouldn't have the same inferences, I hope, that could be drawn as to why they made the moves.

In any event, they made the moves and they did maintain some contact. Based upon the parents as I find them, I find that that contact was reasonable. I do not find that DCFS in anyway inhibited. I think DCFS was doing a good job. I think that these people probably required some special consideration and they were given that, to some extent, the same way that they could have done better; I'm sure DCFS could have done better. But I do not find that they inhibited them in anyway.

Based upon all the evidence before this Court, the Court is going to find that the State has failed to prove from clear and convincing evidence that parental rights should be terminated at this time based upon the record." (Emphasis added.)

## IV. THE STANDARD OF REVIEW

The standard of review applicable to cases involving the termination of parental rights is well settled. In *In re Allen* (1988), 172 Ill. App. 3d 950, 527 N.E.2d 647, the court wrote the following:

"It is well established that a finding of parental unfitness must be supported by clear and convincing evidence. [Citations.] The findings of the trial court must be given great deference since it has the opportunity to view and evaluate the testimony of the witnesses, and the trial court's decision should not be reversed on appeal unless it is contrary to the manifest weight of the evidence." *Allen*, 172 Ill. App. 3d at 956, 527 N.E.2d at 651.

See also *In re A.T.* (1990), 197 Ill. App. 3d 821, 829-30, 555 N.E.2d 402, 408.

## V. DIFFERENCES BETWEEN "REASONABLE PROGRESS" AND "REASONABLE EFFORTS"

In *Allen*, the court distinguished between the two different grounds for a finding of parental unfitness set forth in section 1(D)(m) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m)). Those grounds are (1) the failure by a parent "to make reasonable *efforts* to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable *progress* toward the return of the child to such parent within 12 months after an adjudica-

tion of neglected minor." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)(m).) Specifically, the *Allen* court wrote the following:

"Whether a parent's *efforts* to correct the conditions which were the basis for removing her children are reasonable involves a subjective judgment based upon the amount of effort which is reasonable for a particular person. [Citations.] In contrast, whether a parent's *progress* toward return of the children within 12 months of being adjudicated neglected is reasonable involves an objective judgment based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. [Citations.] At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." (Emphasis in original.) *Allen*, 172 Ill. App. 3d at 956, 527 N.E.2d at 651-52.

VI. REVIEW OF THE EVIDENCE

■ We note that the trial court's findings are contrary, as a matter of law, to the construction appropriately given by the *Allen* court to section 1(D)(m) of the Act that a parent's *progress* (as opposed to her *efforts*) is to be judged by objective standards. Instead, in its findings, the trial court stated that respondents "have to be taken as you find them." The trial court's observation that "[w]hat's reasonable for the [respondents] may not be reasonable for the next people that come before this Court" is similarly not in accordance with an objective standard to determine how much *progress* respondents have made toward the return of L.L.S. to their custody.

In the present case, L.L.S. was removed from Ruby's custody on June 30, 1988, when L.L.S. was 2½ months old. James' whereabouts were then unknown, and Ruby and L.L.S. had been staying at the Inner City Mission. Ruby admitted that she had slapped L.L.S. because she was upset and having difficulty coping with her problems. The objectives of the service plan prepared by DCFS were fully consistent with the demonstrable parental deficiencies of Ruby and James at the time L.L.S. was placed in the custody of DCFS. In that service plan, DCFS appropriately set forth objectives and goals for Ruby and James to meet, to demonstrate thereby that they would be capable of providing an appropriate home for L.L.S.

The service plan established by DCFS in October 1988 and continued thereafter through July 1990 included as its objectives the following requirements of both Ruby and James: (1) psychological evaluations; (2) substance-abuse assessments; (3) treatment as recommended after either the evaluation or the assessment; (4) partic-

ipation in and completion of parent training classes; (5) maintenance of housing; (6) visiting L.L.S. weekly; and (7) showing interest in the child. Short of James obtaining a psychological evaluation, he and Ruby failed miserably to achieve any of these other objectives in 21 months. Indeed, the record shows that for a period of 16 months, neither James nor Ruby even visited L.L.S.; essentially, they are now both strangers to her.

This record *shows without contradiction* the continuing parental deficiencies of Ruby and James. Neither parent completed parenting classes (or ever bothered to attend any), and Ruby did not get a psychological evaluation. James' psychological evaluation stated that, given his DUI history and past incarceration, he needed counseling to become an adequate parent, but he failed to take any steps to get that counseling. The respondents' behavior at the few visits they had with L.L.S. demonstrated their lack of parenting skills and their need for improvement. Neither respondent received a substance-usage assessment. From July 1988 to August 1990, respondents lived in seven cities (and at two or three different residences in each city) and in five States. They separated between four and seven times in the space of 2½ years, and during one of those separations, Ruby lived with another man for six months while she was still married to James. Ruby has not held a job since L.L.S. was born, and James' employment record is spotty and unpromising, at best. In 2½ years, he has held seven different jobs, the longest being for a period of four to five months. He quit two of them and had been laid off or moved from the others. At the time of the adjudicatory hearing, they had lived in Springfield for about eight weeks in the home of another couple. They had no residence of their own, nor any prospects of obtaining one.

Other than the promises of respondents that "things would be better," this record contains not a scintilla of evidence to demonstrate any progress by either respondent toward the establishment for themselves of a permanent, stable residence, much less than for their now three-year-old daughter. The record further shows, again without contradiction, that both respondents had known what was expected of them for at least a year before the termination hearing. Their explanations for their failure to achieve any of the objectives in the service plan are totally inadequate and unacceptable.

### VII. CLARIFICATION OF THE REQUIREMENT OF "REASONABLE PROGRESS TOWARD THE RETURN OF THE CHILD"

As the court stated in *Allen*, "reasonable progress" within section

1(D)(m) of the Act requires, at a minimum, measurable or demonstrable movement toward the goal of the return of the child. (*Allen,* 172 Ill. App. 3d at 956, 527 N.E.2d at 652.) "Reasonable progress" is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future,* will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child.

Judged by this standard, the glacial progress (being generous to even describe it as such) which the parents in the present case made to comply with the objectives of the service plan is not close to being sufficient. Looking at this record, and basing our conclusion upon what the evidence in fact *shows,* as opposed to the idle hopes and musings of the respondents, we hold that no reasonable person could conclude that the respondents have made reasonable progress toward the return in the near future of their child to their custody. "Measurable or demonstrable movement" cannot constitute "reasonable progress," as spoken of in section 1(D)(m) of the Act, if it must be measured with a micrometer. (Compare, *e.g., In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 285, 518 N.E.2d 1316, 1322-23 (and cases cited therein) (in marital property matters, a reviewing court will not substitute its judgment for that of the circuit court unless an abuse of discretion is shown, *i.e.,* "no reasonable man could adopt the trial court's position"); accord *In re Marriage of Zummo* (1988), 167 Ill. App. 3d 566, 575, 521 N.E.2d 621, 627 (award of marital residence will not be deemed an abuse of discretion unless "no reasonable person could take the view adopted by the trial court").) We agree with the State that the evidence received in the present case showed respondents' "reasonable progress" to be wholly lacking, and accordingly, we conclude that the trial court's decision denying the State's petition to terminate parental rights is contrary to the manifest weight of the evidence.

If the trial court's denial of the State's petition were permitted to stand, that decision would condemn L.L.S. to a childhood in foster homes while the courts continue to wait (apparently with unceasing patience) for respondents to "get their act together." The legislature has quite reasonably provided that parents, such as respondents, should have at least 12 months to do that before their parental rights

may be terminated. Respondents have had considerably longer, and their flurry of activity regarding L.L.S. immediately prior to the adjudicatory hearing on the petition to terminate their parental rights can hardly overcome the many months of their demonstrable disinterest.

We are mindful of the great deference to be given to the trial court because of its opportunity to view and evaluate the testimony of the witnesses. However, in this case, granting the trial court its due deference and still reversing is less troubling than it might be in some other case because the evidence before us, on which we base our conclusion, is essentially uncontradicted. In other words, we are prepared to accept the findings regarding the evidence that the trial court made (and that we quoted earlier in this opinion); however, those findings of fact do not support its legal conclusions and ultimate decision.

## VIII. Transcript Of Earlier Juvenile Court Proceeding Is Not Required

In opposition to the State's appeal, respondents have made an additional argument that we now address. Respondents note that the 1990 termination hearing was conducted by a different judge than the one who heard the 1988 neglect proceeding. Respondents further note that no transcript of the 1988 neglect proceeding was presented to the trial judge at the 1990 termination hearing. Respondents then argue that the absence of this transcript deprived the trial court at the termination hearing of the opportunity to determine whether reasonable progress had been made toward the return of L.L.S. They argue that reasonable progress must necessarily be tied to correcting the conditions which caused the removal of L.L.S. in the first place. Accordingly, they claim that the State, by failing to provide the transcript of the 1988 neglect hearing, failed to meet its burden of proving that reasonable progress had not been made. The State has attempted to correct this alleged deficiency by providing this court with transcripts of the shelter care and adjudicatory hearings in 1988, which resulted in the removal of L.L.S. from the custody of her parents.

The respondents' argument and the State's response are consistent with *In re Austin* (1978), 61 Ill. App. 3d 344, 378 N.E.2d 538, in which no record of the proceedings from the hearing leading to the removal of the child from the parents was presented to the trial court at the termination hearing. The *Austin* court wrote the following:

> "[When the court determines whether reasonable progress has been made], the record of the prior proceedings for removal of the child are [*sic*] indispensable. In an unfitness hear-

ing, testimony may well cover the current status of the parents and their activities since removal of the children, but the best evidence of the conditions which compelled removal of the children is that prior record. Because it is impossible to measure progress without referring to a prior status, current status and the process by which movement from the one status to the other occurred, absence of evidence regarding the prior status would render a determination of 'reasonable progress' meaningless. In this appeal the State has moved to supplement the record of the unfitness hearing below with excerpts from the record of the earlier removal hearing. The respondents have objected, arguing that the sole purpose such a record could serve would be to prejudice the reviewing court. The motion to supplement the record is granted because, contrary to respondents' argument, this record is essential to gauging the progress these parents have made, not only at trial (see *In re Robertson* (1977), 45 Ill. App. 3d 148, 359 N.E.2d 491), but also for purposes of review." *Austin*, 61 Ill. App. 3d at 350-51, 378 N.E.2d at 543.

We respectfully disagree with the above portions of *Austin* for two reasons. First, we do not believe it impossible to measure progress without referring to a "prior status, current status[,] and the process by which movement from the one status to the other occurred." In the present case, and in all cases in which a child is removed from a parent's custody after a dispositional hearing (Ill. Rev. Stat. 1989, ch. 37, pars. 802—23, 802—27), a court order to that effect has been entered. The reasons underlying that order should be one of the factors considered when the court (or an agency having the authority to do so, like DCFS in the present case) decides what steps must be taken by the parent to achieve the return of the child to the parent's custody. These steps should be designed to remediate parental deficiencies that, if not remediated, will prevent the child from being returned to the parent's custody. Once these steps have been set forth and provided to the parent, either by the court, an authorized agency, or both, then the focus of subsequent inquiry ought to be on the parent's progress or success in complying with the court's directives, the service plan, or both.

If, as here, the State subsequently challenges the parent's fitness under section 1(D)(m) of the Act on the ground that the parent has failed to make reasonable progress toward the return of the child within 12 months after the child was adjudicated neglected, abused, or dependent, the standard by which progress is to be measured is pa-

rental compliance with the court's directives, the service plan, or both. The precise circumstances of the parent at the time the court ordered the child removed from the child's parent and before the service plan was in place are *not* "indispensible" (*Austin*, 61 Ill. App. 3d at 350, 378 N.E.2d at 543). While the court, in its discretion, might decide that the record of the prior proceedings which resulted in the removal of the child from the parent's custody could be helpful to the court to better understand the parent's previous circumstances, that record *need not* be received into evidence; further, if that record is received into evidence, it *ought not* be the focus of the court's inquiry at the termination hearing.

In the present (and in the usual) case there is no dispute regarding the steps the parents were to take to regain custody of their child. As we discussed earlier in this opinion, those steps were set forth as the objectives of the service plan. When, as here, there is no such dispute, the record of the proceedings in which it was first determined that the child should be removed adds nothing to assist the court in determining whether "reasonable progress" (under section 1(D)(m) of the Act) has been achieved.

As an example, if a four-year-old child is found to have been physically abused by her mother and ordered removed from her mother's custody for that reason (Ill. Rev. Stat. 1989, ch. 37, pars. 802–3(2)(v), 802–21(2), 802–22(1), 802–23(1)(a), 802–27(1)(d)), the court may require the mother to remediate other parental deficiencies beyond those related to inappropriate physical discipline. In an appropriate case, the court can (and *should*) order the mother to (1) attend and successfully complete parenting classes, (2) obtain an assessment regarding drug abuse and, if present, take appropriate steps to overcome her problem, (3) provide a stable and safe environment for the child, and (4) take any other steps the court believes necessary before the child is to be returned. A parent is not divisible into neat compartments; a child who is placed into a parent's custody "gets the whole package," and a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody.

For the reasons stated, we hold that the transcript of the adjudicatory hearing in the present case was not necessary to enable the trial court (or this court) to gauge the "reasonable progress" of the respondents to achieve the return of their child to their custody.

Our second point of disagreement with *Austin* is that if the transcript of the earlier proceeding is in fact necessary to be presented at the termination hearing, then the State's failure to do so can hardly

be overcome by supplementing the record on appeal. After all, this is a court of *review,* meaning we are supposed to be *reviewing* the evidence presented to the trial court and its rulings and findings thereon. No citation is necessary for the propositions of law that (1) courts of review do not receive evidence, and (2) a party who has failed to present evidence at the trial level necessary to sustain his burden of proof may not overcome that deficiency by presenting that evidence to the court hearing the case on appeal. *Austin* indicates otherwise, and we respectfully decline to follow it in this regard. Thus, if the State here were required to introduce the transcript of the earlier proceeding at the termination hearing, then the State's failure to do so must result in an affirmance of the trial court's denial of the State's petition to terminate parental rights *based upon that failure alone.*

## IX. Suggested Procedures For Trial Courts Hearing Abuse, Neglect, Or Dependency Cases

■■ Some of the issues we have addressed in this opinion could (and should) be avoided if trial courts hearing abuse, neglect, or dependency cases acted with the awareness that, under section 1(D)(m) of the Act, every such case which results in a formal adjudication of wardship and the removal of a child from parental custody (under section 2—27 of the Juvenile Court Act of 1987 (Juvenile Court Act) (Ill. Rev. Stat. 1989, ch. 37, par. 802—27)) has the *potential* to be a case in which the State might seek the termination of parental rights. By definition, no one can know whether the parents will succeed in making either "reasonable efforts" or "reasonable progress" under section 1(D)(m) of the Act to achieve the return of their child to their custody, or fail in some other respect within the meaning of section 1(D) of the Act.

The legislature has determined that one of the goals of proceedings under the Juvenile Court Act shall be to "preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her welfare or safety or the protection of the public cannot be adequately safeguarded without removal." (Ill. Rev. Stat. 1989, ch. 37, par. 801—2(1).) Accordingly, when a child has been formally adjudicated a ward of the court and removed by the court's dispositional order from the custody of the child's parents, the court should direct that steps be taken, through DCFS or other appropriate agencies, to achieve a reconciliation and a reunification of the family unit. These directions should include specific steps the respondent parents must take to cor-

rect problems in their lives and specific parental deficiencies which led or contributed to the removal of the child in the first place. If at all possible, the trial court should set forth those steps in a written dispositional order, thereby derailing any later claim that the parents either were not informed or did not understand what they were required to do in order to regain custody of their child. Another benefit of using a written dispositional order is that it contains the imprimatur of the court, as opposed to a mere service plan prepared by DCFS.

After a minimum of 12 months following an adjudication of neglect, abuse, or dependency, if a parent has not, in the judgment of the State's Attorney, demonstrated either "reasonable efforts" or "reasonable progress" to achieve the return of the child to the parent's custody, then the State should file a petition to terminate parental rights in order to give the court the opportunity to determine whether the State can prove parental unfitness under section 1(D)(m) of the Act.

We describe this sequence of events because it demonstrates the importance of the court's stating on the record at the dispositional hearing in the underlying neglect, abuse, or dependency, and in the later written dispositional order, precisely what steps the parents must take in order to achieve the return of the child to their custody. When the court does so at this hearing, not only is a record made, but the parties also then have an opportunity to seek either an amendment or a clarification of the steps the court is requiring. Typically, the court will base its order upon a dispositional report prepared by DCFS (or some other appropriate agency), containing suggested steps that were furnished in advance of the dispositional hearing to all parties. See Ill. Rev. Stat. 1989, ch. 37, par. 802—22(2) (requiring the court to advise the parties of the factual contents and conclusions of a report prepared for the court's use and considered by it at the dispositional hearing, and which affords an opportunity, if requested, for the parties to controvert those contents and conclusions).

We do not suggest by these remarks that a DCFS service plan (as used in the present case) is deficient as a matter of law to serve as a basis for measuring "reasonable progress" by the parents to achieve the return of their child to their custody. Instead, we are merely pointing out what the better practice would be and how some of the issues we have had to deal with in this case could have been avoided. We acknowledge that it may well be appropriate for the court in its dispositional order to provide that, in addition to the specific directives of the court, the parents are to cooperate with DCFS (or some

other designated agency) regarding participation by the parents in various services and programs as directed by DCFS (or some other designated agency), which are designed to complement and further the court's directives.

### X. CONCLUSION

For the reasons stated, the trial court's order denying the State's petition to terminate the parental rights of respondents is reversed, and this cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

GREEN and McCULLOUGH, JJ., concur.